[Civ. No. 4626. Fifth Dist. Jan. 29, 1982.]

DOROTHY MARY TRUHITTE et al., Plaintiffs and Respondents, v. FRENCH HOSPITAL, Defendant, Cross-complainant and Respondent;
R. MARSHALL JELDERKS, Defendant, Cross-complainant and Appellant.

336

**COUNSEL**

Duenow, Burke & Smith and E. Jeffrey Burke for Defendant, Cross-complainant and Appellant.

Korman Dorsey Ellis and Margo Davis for Plaintiffs and Respondents.

Archbald & Spray, John Patrick McEvoy and Douglas B. Large for Defendant, Cross-complainant and Respondent.

---

## Opinion

HANSON (P. D.), J.—This is an action for medical malpractice for failure to remove a large surgical sponge from plaintiff and respondent Dorothy Mary Truhitte's abdomen during a hysterectomy. The sponge or "GYN tape" remained undiscovered for more than two years, causing serious complications; it was removed in a second surgery. Plaintiff then suffered a total bowel obstruction requiring a third operation.

On June 7, 1977, plaintiffs Mr. and Mrs. Truhitte filed a complaint for damages. Mrs. Truhitte alleged that the hospital and the doctor, directly and through their agents, negligently left "foreign bodies" in her abdomen following a surgery performed between March 28 and April 4, 1974, proximately causing general and special damages. In a second cause of action, Mr. Truhitte alleged a loss of consortium resulting from his wife's injury.

The hospital and doctor denied liability. Each defendant filed a cross-complaint against the other on theories of total equitable indemnity and partial or comparative equitable indemnity or contribution.

A jury returned special findings that both defendants were liable for plaintiffs' injuries, awarding damages totaling $87,393.67, apportioning 55 percent of the negligence to the hospital, 45 percent to the doctor, and specifically finding that the operating room nurses were the hospital's agents, not the doctor's.

The hospital filed a motion for judgment notwithstanding the verdict on the ground that the evidence established that the operating room nurses were the temporary servants or agents of the doctor. The court entered judgment on the jury's special findings.

Plaintiffs filed a notice of intention to move for new trial on several grounds, including inadequacy of damages. The doctor filed opposition to the motion for a judgment notwithstanding the verdict; a hearing on both motions was held and the motions were submitted for decision.

The court granted the judgment notwithstanding the verdict in favor of the hospital. The court also entered a conditional order granting a new trial on the ground of inadequacy of damages, the new trial to be granted unless the doctor consented in writing to an additur raising the total amount of the judgment to $125,000 (apportioned $115,000 to Mrs. Truhitte and $10,000 to Mr. Truhitte). The court filed a specification of reasons for the new trial order.

The doctor having failed to consent to the additur, the court entered its order granting plaintiffs a new trial on all issues and filed its order granting a judgment notwithstanding the verdict in favor of the hospital, vacating the judgment on the jury's special findings. The court also entered a judgment on both cross-complaints in favor of the hospital, ordering that the liability of the hospital be apportioned at 0 percent and that of the doctor at 100 percent notwithstanding the jury's special findings.

The doctor appeals[1] from the judgment notwithstanding the verdict in favor of the hospital, the order granting plaintiffs a new trial, and the judgment in favor of the hospital on the cross-complaints. Appellant seeks reinstatement of the original judgment and entry of judgment on the cross-complaints consistent with the jury's special findings.

We conclude that the trial court erred in granting the judgment notwithstanding the verdict vacating the jury's findings on agency, but affirm with directions the order granting plaintiffs a new trial.

### STATEMENT OF FACTS

On March 29, 1974, Dr. Jelderks performed a vaginal hysterectomy on Mrs. Truhitte at French Hospital. Gerald Villa was the scrub nurse in attendance and Wanda Davidson the circulating nurse; sponge counts were made and reported by the nurses to be correct. However, a long, narrow sponge or tape, known as the "GYN tape" or "Jelderks' tape" was left inside Mrs. Truhitte's abdomen.

After the operation, Mrs. Truhitte experienced intermittent but recurring stomach cramps. In 1976, Dr. Ferris discovered a mass in her pelvis which he thought might be a cyst. Dr. Jelderks performed a sec-

---

[1]The notice of appeal was filed on January 17, 1979, before entry of judgment on the court's orders. We treat the notice as filed immediately after entry of judgment under California Rules of Court, rule 2(c).

ond operation on November 11, 1976, discovered the "GYN tape" and removed it. Mrs. Truhitte continued to suffer chronic abdominal pain caused by adhesions and abcesses, and on November 4, 1977, had a third operation for a total bowel obstruction.

Nurse Gerald Villa, Doctors Mahnke, Weinberger and Jelderks testified concerning operating room and surgical procedures. Mr. Villa, an operating room technician and an employee of defendant French Hospital, assisted during operations as either scrub nurse or circulating nurse. He testified: "The scrub nurse is the one that is the sterile nurse, the one that is gowned and gloved and sets up the field, the operating room field to assist the surgeon, and takes care of the sutures and the instruments and the tapes, sponges and needles.

"The circulating nurse is the nurse that's unsterile, that takes care of whatever sundry things go on during the case, [for example] ... [if] the doctor requested a special instrument that we didn't have in the room, ... she would go get that and open it and give it to me."

In the 1974 operation on Mrs. Truhitte, Mr. Villa was assigned by the hospital's operating room supervisor as scrub nurse, and Wanda Davidson, another French Hospital employee, was circulating nurse. According to Mr. Villa, he was assigned as scrub nurse for Dr. Jelderks' surgery whenever available by request of Dr. Jelderks.

As scrub nurse, Mr. Villa prepared the operating room for the surgery according to established hospital procedure. Standard instrument trays and linen packages for particular types of surgeries are enclosed in sterile wrappings by the supply department of the hospital, and are brought into the operating room by the nurse. The instruments are checked against the surgeon's preference card; the instruments are then unwrapped and the tray set on the "Mayo" stand near the foot of the operating table.

Written hospital rules[2] require the hospital nurses to conduct sponge counts. According to Mr. Villa, the regulations for sponge and needle

[2]Following Mr. Villa's testimony, appellant sought to introduce in evidence all or selected portions of the French Hospital "Surgery Procedure Manual." (Defendant Jelderks' exhibit C for identification.) The hospital objected that no adequate foundation for the document's admission had been laid and also objected that the evidence was cumulative; the objection was sustained. Despite the fact that the manual was excluded and did not go to the jury, appellant refers to and even quotes portions of the document in his brief. As no issue is raised regarding the correctness of the evidentiary ruling, the document is not properly before this court.

counts are necessary in order for the hospital to be accredited. Under established hospital procedure, the initial sponge count is done by the operating room nurses while setting up for the surgery. This normally takes place before the surgeon arrives. The sponges and tapes are placed on the back table, against one wall of the operating room. Under hospital rules, the scrub nurse counts the sponges, watched by the circulating nurse, who verifies the count and notes the number of each type of sponge on a piece of paper. This notation is the basis for the second and third counts which are made prior to closing the incision and after completion of the surgery. The notation is not made on a form listing the various types of sponges and tapes, and it is not kept as a record after the surgery.

Mr. Villa said that the standard GYN linen pack included 30 "four by four" sponges and 10 large laparotomy or "lap tapes." Additionally, a special "GYN tape" is part of the standard array included in the sponge count. However, this item, a distinctive, long, narrow packing, developed and manufactured by the hospital at Dr. Jelderks' request for use in vaginal hysterectomies, is separate from the other sponges and included by hospital policy in the instrument tray.

Sponges are counted before the beginning of the operation to enable the nurses to advise the surgeon at the time of closure whether or not all have been removed from the patient's body. The initial sponge count for Mrs. Truhitte's hysterectomy was done while Dr. Jelderks was scrubbing outside the operating room. This count, not requested or reported to the surgeon, is done automatically as a routine nursing service. Mr. Villa testified that before Mrs. Truhitte's surgery, the sponges were counted as described above, and the number of each kind recorded by Ms. Davidson. Villa could not specifically recall that the "GYN tape" was listed; however, "it was routine that it was written down." Mr. Villa admitted that omission of the "GYN tape" from this list could be a possible reason why the subsequent sponge counts were reported to be correct.

The second sponge count was performed by the operating room nurses immediately prior to closing the body cavity, in this case, the edges of the peritoneum. The used sponges were handed to Mr. Villa, who collected them on a waterproof sheet. With Ms. Davidson's assistance, the number of used and unused sponges was compared with the number previously recorded. When Mr. Villa reported the count to be

"correct," meaning that all sponges, including the "GYN tape," were accounted for, Dr. Jelderks completed the closure.

A third and final count is made after the surgery. This is done automatically, without request. In this instance, the count was again reported "correct," and the operating room nurses prepared and signed an operating room report form, indicating this fact.

The surgeons who testified agreed that the surgeon does not participate in any of the sponge counts. This is standard practice, although sponges can be and are misplaced occasionally during surgery. Dr. Mahnke testified that it would be difficult and unacceptable for the surgeon to join in the count, as his attention is occupied with the surgery.

The doctors also agreed that it would be bad practice to probe the area of the surgery if the sponge count is correct because of risk of harm to raw tissues, loosening sutures, causing bleeding, introducing infection or disturbing organs. Surgical sponges have strips or tapes designed to be attached to something to aid in remembering and locating the sponge; these "aid[s] to memory" are currently utilized. However, no such visual aids-to-memory were employed by Dr. Jelderks in the Truhitte surgery. All sponges utilized in surgery contain radioopaque markers. If a sponge count is reported to be incorrect and the missing sponge is not immediately found in the drapes or elsewhere outside the patient's body, a portable X-ray may be used to determine its presence.

The medical testimony was also unanimous that the surgeon has the responsibility for removing everything from the surgical site which he has placed there. Sponges may be misplaced during surgery and overlooked because they become blood-soaked or are hidden by the movement of body tissues or organs, particularly the bowel. In the vaginal hysterectomy procedure performed on Mrs. Truhitte, the "GYN tape" was used as packing to keep the bowel away from the surgical site. Dr. Jelderks placed the tape in Mrs. Truhitte and was aware that a vaginal hysterectomy affords a very narrow view of the surgical field.

Dr. Jelderks is a private physician, with staff privileges at French Hospital. He testified that he does not select, hire, train or pay the operating room nurses, nor does he have the power to fire them.

Maurice Truhitte testified that he and his wife had been married for 23 years and had 2 boys, 19 and 17 at the time of trial, who were 15 and 13 in 1974. The Truhittes started an automotive repair business in San Luis Obispo in 1960 or 1961; Mrs. Truhitte assisted with the books and inventory, meeting customers, answering the phones and picking up parts; before the hysterectomy, Mrs. Truhitte customarily worked at the shop from 8:15 to 4 or 4:30 p.m., and sometimes on Saturday.

Mr. Truhitte said that formerly the family went somewhere together every weekend, waterskiing in summer and dirt-bike riding in winter; Mrs. Truhitte always accompanied them and participated. She was young and lively and had only minor stomach problems.

After Mrs. Truhitte's surgery in 1974, stomach pains caused her to get up crying during the night; she would take hot baths and medicine, trying to alleviate the pain. She could not travel with the family; "She just never felt herself after that first operation and she just stayed closer to home." Mrs. Truhitte was cross with the children and stopped coming to the shop because of cramps in her stomach. Although she had recurring pain, she was reluctant to see the doctor. Mr. Truhitte said that because Mrs. Truhitte never got well after the operation, there was a lot of tension at home and sexual relations were unsatisfactory.

After the second surgery in 1976, Mrs. Truhitte tried to resume work "but she just went down and down and ... today, she spends less time than she ever did." At the time of trial, Mrs. Truhitte could work only two hours a day, and averaged only six hours a week. Mrs. Truhitte's activities with the family also were much restricted; since 1977, she had had to cancel plans to go on several trips.

Mrs. Truhitte testified that her life changed much since the first operation. Prior to that time, she had taken an active part in the family business, helping out in the office and driving to San Luis Obispo or Morro Bay to pick up parts on a daily basis. She said that she had worked from 8:15 a.m. to 5 p.m. She had also participated every weekend in recreational activities with her husband and two sons. Her general health had been very good.

Mrs. Truhitte testified, "I have pains every day that remind me of what I have gone through and what might yet come." She said she wakes up with pain and fears the need for yet another operation. Although pain medication had been prescribed, it did not help very much.

Ella Garrison, Mrs. Truhitte's sister, testified that prior to Mrs. Truhitte's operation in 1974, she was "always cheerful, good mood, always busy." After the operation, Mrs. Truhitte seemed quiet and worried, and told her sister she was afraid she had cancer.

Dr. Karger, who operated on Mrs. Truhitte to remove the total bowel obstruction, testified that she was likely to have continuing problems of a similar nature which, if total or sufficiently severe, might be corrected by another operation. With one of three possible surgical procedures, there would be an 80 to 85 percent chance of experiencing no further problems, although Karger could not guarantee no further pain. If intermittent distress from partial bowel obstruction continued, the patient would have to make a choice of living with the pain, or chancing the surgery.

The jury was instructed that Mrs. Truhitte had a life expectancy of 30 years, and Mr. Truhitte a life expectancy of 22 years.

## DISCUSSION

■ The trial court erred in granting a judgment notwithstanding the verdict in favor of the hospital on the theory that Dr. Jelderks was solely liable for the negligence of the operating room nurses under the borrowed-servant doctrine.

Code of Civil Procedure section 629[3] provides that a judgment notwithstanding the verdict is proper where a directed verdict should have been granted if such a motion had been made. (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 374.) ■ ■ "Such a motion may be granted, properly, only when, disregarding the conflicting evidence, and indulging in every legitimate inference in favor of the plaintiff, the result is a determination that there is no evidence of substantial nature to support the verdict. The trial court, on such motion, is not permitted to weigh the evidence, and on an appeal from the judgment entered on the granting of such a motion, the appellate court must read the record in the light most advantageous to the plaintiff, resolve all conflicts in his

---

[3]Code of Civil Procedure section 629 provides in part: "The court, before the expiration of its power to rule on a motion for a new trial, either of its own motion, after five days' notice, or on motion of a party against whom a verdict has been rendered, shall render judgment in favor of the aggrieved party notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted had a previous motion been made."

favor, and give him the benefit of all reasonable inferences in support of the judgment." (*Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 159 [41 Cal.Rptr. 577, 397 P.2d 161].) In determining the propriety of the trial court's action we are required to "apply the substantial evidence test to the jury verdict, ignoring the judgment." (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 546 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158].)

■ The hospital's motion for judgment notwithstanding the verdict was based on the sole contention that "[t]here was not sufficient evidence to support the finding that [J]erry Villa and Wanda Davidson were not the temporary agent or servant of defendant Jelderks at the time of the incident giving rise to this litigation." Respondent argues that the order of the trial court granting the motion was correct because the surgeon has a nondelegable duty to remove all foreign objects from the surgical site; the evidence established, as a matter of law, that the operating room nurses. were the borrowed servants of Dr. Jelderks; Dr. Jelderks assumed the risk of error in the sponge-accounting procedure; and his negligence was a superseding cause of plaintiffs' damages. We disagree with the hospital's assertion that, under the facts and existing law in California, the jury could not find the nurses to be agents of the hospital. Hospital's remaining contentions are without merit.

■ It is a general rule of the law of agency that, if one employer lends the services of his employee to another employer, the second or special employer temporarily may be liable for the employee's tortious acts. (1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, § 158; Rest.2d Agency, § 227.) The principle is explained in *Marsh* v. *Tilley Steel Co.* (1980) 26 Cal.3d 486 [162 Cal.Rptr. 320, 606 P.2d 355], a case involving "the interplay between tort and workers' compensation remedies": "When an employer—the 'general' employer—lends an employee to another employer and relinquishes to a borrowing employer all right of control over the employee's activities, a 'special employment' relationship arises between the borrowing employer and the employee. During this period of transferred control, the special employer becomes solely liable under the doctrine of respondeat superior for the employee's job-related torts. [Citations.]

"The special employment relationship and its consequent imposition of liability upon the special employer flows from the borrower's power to supervise the details of the employee's work. Mere instruction by the borrower on the result to be achieved will not suffice. Moreover, Cali-

fornia courts have held that evidence of the following circumstances tends to negate the existence of a special employment: The employee is (1) not paid by and cannot be discharged by the borrower, (2) a skilled worker with substantial control over operational details, (3) not engaged in the borrower's usual business, (4) employed for only a brief period of time, and (5) using tools and equipment furnished by the lending employer. [Citations.] Additionally, where the servants of two employers are jointly engaged in a project of mutual interest, each employee ordinarily remains the servant of his own master and does not thereby become the special employee of the other. [Citations.]" (*Id.*, at pp. 492-493.) Also, "Facts demonstrating the existence of a special employment relationship do not necessarily preclude a finding that a particular employee also remained under the partial control of the original employer. Where general and special employers share control of an employee's work, a 'dual employment' arises, and the general employer remains concurrently and simultaneously, jointly and severally liable for the employee's torts. [Citations.]" (*Id.*, at pp. 494-495.)

The Supreme Court noted that the existence of a special employment is most often resolved on inferences from circumstantial evidence. Where the evidence permits conflicting inferences, the issue is a question for the trier of fact. (*Marsh* v. *Tilley Steel Co., supra*, 26 Cal.3d 486, 493.)

The "captain of the ship" doctrine upon which the trial court relied is a special application of the borrowed-servant rule that has developed in medical malpractice cases on the theory that the surgeon is in complete control of all activities in the operating room.[4] The limits of this doctrine—when and under what circumstances the hospital may be liable for the negligence of its nurse-employees who assist a surgeon—is the subject of an excellent annotation, "Liability of Hospital for Negligence of Nurse Assisting Operating Surgeon" (1970) 29 A.L.R.3d 1065. It appears from that discussion the "captain of the ship" theory had its inception in an era when nurses as well as doctors were regarded as

---

[4]This doctrine is stated as follows in BAJI No. 6.06 given in this case: "Regardless of who employs or pays [a nurse] [or] [an assisting surgeon] who takes part in the performance of surgery or services incidental to such surgery, if, while engaged in any such service, [the assisting surgeon] [the nurse] is under the direction of a certain surgeon in charge, so as to be his temporary servant or agent, any negligence on the part of any such assisting person, occurring while the latter is under the surgeon's direction, is deemed in law to be the negligence of such surgeon."

independent contractors (see *Ware* v. *Culp* (1937) 24 Cal.App.2d 22, 28-31 [74 P.2d 283]), and many hospitals were protected from liability by charitable immunity. While the independent contractor and charitable immunity bases for absolving the hospital from liability for negligent acts of a nurse who was a hospital employee have long since been abandoned in California (see *Rice* v. *California Lutheran Hospital* (1945) 27 Cal.2d 296 [163 P.2d 860] and *Malloy* v. *Fong* (1951) 37 Cal.2d 356 [232 P.2d 241]), no case has expressly rejected the special rule making a nurse the borrowed servant of the surgeon rather than the hospital as to *any* act while assisting during a surgery. (See BAJI No. 6.06, fn. 4, *ante.*)

The most positive statement of the "captain of the ship" rule appears in *Ales* v. *Ryan* (1936) 8 Cal.2d 82 [64 P.2d 409], a sponge case in which the patient died of peritoneal infection and the administrator went to trial against the doctor only. The court, in reversing a judgment for the defendant, held that it was error to refuse to instruct that the surgeon had a nondelegable duty to make certain that all sponges were removed from the patient's body. (*Id.*, at pp. 103-105.) In so holding, the court also said: "The surgeon in absolute charge of and who is directing the operation, as defendant was doing under the admitted facts of the instant case, is responsible for the negligent act of the assistant in failing to remove a sponge from the abdomen." (*Ibid.*)

In the famous res ipsa loquitur case of *Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 492 [154 P.2d 687, 162 A.L.R. 1258], the court in dicta stated that: "... the doctor in charge of the operation would be liable for the negligence of those who became his temporary servants for the purpose of assisting in the operation.

"In this connection, it should be noted that while the assisting physicians and nurses may be employed by the hospital ... they normally become the temporary servants or agents of the surgeon in charge while the operation is in progress, and liability may be imposed upon him for their negligent acts under the doctrine of *respondeat superior*. Thus a surgeon has been held liable for the negligence of an assisting nurse who leaves a sponge or other object inside a patient, and the fact that the duty of seeing that such mistakes do not occur is delegated to others does not absolve the doctor from responsibility for their negligence." (Citing *Ales* v. *Ryan, supra*, 8 Cal.2d 82 and *Armstrong* v. *Wallace*

(1935) 8 Cal.App.2d 429 [47 P.2d 740], another sponge case, in which the hospital was found to have charitable immunity.)

Despite the unqualified language employed in the above opinion, subsequent cases have adopted an ad hoc approach in determining whether the assistant was a temporary employee, looking to the question of actual control or direction by the surgeon over the particular function under the facts of the case. For example, several cases uphold trial court rulings or jury findings that anesthesiologists or anesthetists are not borrowed servants of a surgeon, or are agents of a hospital. (*Seneris* v. *Haas* (1955) 45 Cal.2d 811, 829-832 [291 P.2d 915, 53 A.L.R.2d 124]; *Cavero* v. *Franklin etc. Benevolent Soc.* (1950) 36 Cal.2d 301, 308 [223 P.2d 471] [nurse-anesthetist]; *Marvulli* v. *Elshire* (1972) 27 Cal.App. 3d 180, 184-187 [103 Cal.Rptr. 461] [anesthesiologist and nurse]; *Kennedy* v. *Gaskell* (1969) 274 Cal.App.2d 244, 247-250 [78 Cal.Rptr. 753].)

Other cases hold that the surgeon is not liable as a special employer for negligent acts of a nurse performed while not under the surgeon's direct supervision and control, as in duties in preparation for an operation (*Hallinan* v. *Prindle* (1936) 17 Cal.App.2d 656, 661-662 [62 P.2d 1075]), or in postoperative care (*Sherman* v. *Hartman* (1955) 137 Cal. App.2d 589, 594-597 [290 P.2d 894]). In *Hallinan* v. *Prindle, supra,* 17 Cal.App.2d 656, the nurse in preparing the operating tray mistakenly substituted formalin (a powerful disinfectant) for the requested solution of novocaine; the site of the injection was severely burned. The court said: "We see nothing in this evidence to support the plaintiff's contention that Miss MacKinnon, in preparing the tray for the operation, was the servant or employee or even the agent of the doctor. While, if the doctor were performing such an operation at the home of the patient, or in his office, without assistance these preparations would necessarily devolve upon him, there is nothing in their nature which renders it improper or even undesirable that they be undertaken by another person, qualified by training and experience, acting in cooperation with the surgeon. This, in fact, under present-day conditions is what usually takes place. The patient enters a hospital, which is specially equipped with its operating room, modern surgical appliances and trained nurses for the purpose of rendering this precise service, and a charge therefor is made directly to the patient. The nurse in performing her duties in the operating room is acting for her employer, the hospital, and not for the operating surgeon, who cannot be held responsible for her negligent acts unless performed under conditions where, in the

exercise of ordinary care, he could have or should have been able to prevent their injurious effects and did not.

"The rule is thus laid down in 48 Corpus Juris, Physicians and Surgeons, section 144, page 1137: 'A physician is not liable for the negligence of hospital or other nurses, attendants or internes who are not his employees if he has no knowledge thereof, or has no connection therewith, or if it is not discoverable by him in the exercise of ordinary care, or unless he is negligent in permitting them to attend the patient.' [Citations.] 'But it has been held that where a hospital nurse, although not in the regular employ of an operating surgeon, is under his special supervision and control during the operation the relation of master and servant exists, and that the surgeon is liable under the doctrine of *respondeat superior* for the nurse's negligence.' [Citation.] We think it plain from the evidence that the acts of preparation performed by Miss MacKinnon were not done under the special supervision and control of Dr. Prindle; on the contrary, as we have seen, they were performed by her in his absence. That they were done at his request or direction has no significance, since she was merely attending to duties devolving upon her as an employee of the hospital; and whether performed by her at the direction of an officer of the hospital made in pursuance of a previous notification by the doctor (as they well could have been), or upon the request of the doctor made directly to her, cannot affect the legal situation." (*Hallinan* v. *Prindle, supra*, 17 Cal.App.2d at pp. 661-662.)

■ The clear rule derived from these cases is that agency is a question of fact for the jury. (See also *Quintal* v. *Laurel Grove Hospital, supra*, 62 Cal.2d 154, 166-168.) We question whether the "captain of the ship" doctrine has any remaining independent existence: the vicarious liability of a surgeon for the independent negligence of nurses and other assistants is determined in the cases under the general rules of agency. The "captain of the ship" doctrine arose from the need to assure plaintiffs a source of recovery for malpractice at a time when many hospitals enjoyed charitable immunity; other jurisdictions are moving away from a strict application of the doctrine. (See Annot., *supra*, 29 A.L.R.3d 1065.) A theory that the surgeon directly controls *all* activities of whatever nature in the operating room certainly is not realistic in present day medical care. Today's hospitals hire, fire, train and provide day-to-day supervision of their nurse-employees. Fortunately, hospitals can and do implement standards and regulations governing good surgery practices and techniques and are in the best position to en-

force compliance; hospitals also are in a position to insure against the risk and pass the cost to consumers.

Other jurisdictions draw a distinction between acts performed by a nurse in the operating room which require medical skill and judgment, and those which are "administrative" or "clerical." In performing "medical" duties, the nurse is generally held to be a borrowed servant of the surgeon; as to "administrative" functions, the nurse is considered the servant of the hospital. (Annot., *op. cit. supra*, 29 A.L.R.3d at pp. 1068-1069, 1075-1078.)

In addition to BAJI No. 6.06 (see fn. 4, *ante*), the trial court gave the following special instructions requested by the hospital: "It is established that Gerald Villa and Wanda Davidson were the employees of defendant French Hospital. Therefore, any negligent act or omission of either Gerald Villa or Wanda Davidson was in law the act or omission of defendant French Hospital, unless, from the evidence you find that Gerald Villa and Wanda Davidson, or either of them, were the temporary servants or employees of defendant Doctor Jelderks at the time of their negligent act or omission." (Modified from BAJI No. 13.04.)

"You are instructed that defendant, Dr. Jelderks, was the physician in charge of the surgical procedure performed on Mrs. Truhitte on March 29, 1974, and it was his duty and responsibility to see that all foreign objects were removed from the surgical site before he closed the incision. This duty and responsibility cannot be delegated to a nurse." (Citing *Ales* v. *Ryan, supra,* 8 Cal.2d 82.)

The argument of the hospital in the trial court and on appeal confuses two distinct concepts: the nondelegable nature of the *surgeon's* duty to remove sponges, and the basis for imposing *vicarious* liability on the surgeon under the borrowed-servant doctrine for the independent negligence of the nurses. It is the law of California that the surgeon's duty to remove all sponges and other foreign objects from the patient's body is nondelegable. (*Ales* v. *Ryan, supra,* 8 Cal.2d 82.) However, it does not follow that the hospital may escape liability for its independent negligence in failing to devise adequate sponge-accounting procedures or in negligently carrying out such procedures through its employee-nurses.

In *Leonard* v. *Watsonville Community Hosp.* (1956) 47 Cal.2d 509, 520 [305 P.2d 36], the court reversed a nonsuit in favor of the hospital

and nurse in a case where a Kelly clamp had been left in the patient's abdomen after surgery. No instrument count was requested by the surgeon, and such a count was not an established practice of the hospital or its nurses. The court stated: "We cannot say as a matter of law that there was no duty on the part of the hospital and nurses to keep an instrument count in order to assist the surgeon in determining whether all instruments used had been removed from the patient before final closure." (*Id.*, at p. 520.)

We find, in light of the cases discussed above, that the jury reasonably could determine that the operating room nurses were agents of the hospital at the time of their negligence; therefore, the judgment notwithstanding the verdict must be reversed.

By reasonable inference from the evidence, the jury could find that the nurses negligently performed the initial inventory of the sponges, a procedure required by the hospital to be completed as a routine function before the arrival of the surgeon. In fact, several circumstances indicate that an incorrect initial inventory is a likely explanation for the mishap. Only one of the GYN tapes was used and the tape is of a distinctive size and shape. Had the GYN tape been documented initially on the sponge list, its later absence surely would have been noted when the two counts were made during and after the operation. The GYN tape was segregated, by hospital practice, from the other sponges counted; it was kept on a different table and could have been missed in the initial inventory. These factors suggest a reasonable likelihood of omission at a time before the surgeon arrived and theoretically took control of the operating room.

Also, the jury might have considered that the informality of procedure for the initial checklist fell below the standard of care required of the hospital. For example, use of a printed checklist might prevent the type of omission which occurred.

As stated in *Castro v. State of California* (1981) 114 Cal.App.3d 503, 513 [170 Cal.Rptr. 734], "[i]n attempting to uphold the trial court's action, defendant cites evidence favorable to it and ignores evidence and inferences favorable to plaintiff. ▇ In order to uphold an order granting a motion for judgment notwithstanding the verdict, it must be shown that, viewing the evidence in the light most favorable to the party who received the verdict, there was no substantial evidence to

support the verdict." Here, the record supports the jury's finding of agency, and the judgment notwithstanding the verdict is improper.

■ The trial court did not abuse its discretion in ordering a new trial on insufficiency of damages. The jury awarded plaintiffs the following damages:

(1) Medical and hospital expenses up to the time of trial: $8,101.67;

(2) loss of earnings to the time of trial: $17,600;

(3) loss of earning capacity, based on an estimated work life of 15 additional years: $12,168;

(4) future medical and hospital expenses (30-year life expectancy): $12,500;

(5) pain and suffering: $33,824; and

(6) plaintiff Maurice Truhitte's loss of consortium: $3,200.

Plaintiffs argued that, based on the amount of Mrs. Truhitte's prior medical and hospital expenses, her loss of earnings, change in lifestyle, pain, and the testimony that she is likely to continue to have problems, the award for future damages was inadequate. The judge agreed with this analysis and, after allowing appellant the opportunity to agree to additur to bring the total amount of the award to $125,000, ordered a new trial.

Code of Civil Procedure section 657 authorizes the granting of a new trial for various grounds, including inadequate damages. The statute requires that: "When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated."

Section 657 further provides: "On appeal from an order granting a new trial ... upon the ground of excessive or inadequate damages, it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, and such order shall be reversed as to such ground only if there is no substantial basis in the record for any of such reasons."

■ These rules have been interpreted to require that the judge granting a new trial "furnish[] a concise but clear statement of the reasons why he finds one or more of the grounds of the motion to be applicable to the case before him." (*Mercer* v. *Perez* (1968) 68 Cal.2d 104, 115 [65 Cal.Rptr. 315, 436 P.2d 315].) "In specifying its reasons for granting the motion for a new trial, the trial court must briefly identify the portion of the record which convinces the court that the jury clearly should have reached a different verdict. [Citations.] Where the specification of reasons in the order granting a new trial is inadequate . . ., the new trial order must be reversed, and the judgment will be automatically reinstated [citations]. Where the trial court's specification of reasons adequately complies with the requirements of section 657, the court's new trial order will be upheld on appeal if there is any substantial evidence in the record to support the specified reasons [citation]." (*Widener* v. *Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415 [142 Cal.Rptr. 304], cert. den., 436 U.S. 918 [56 L.Ed.2d 759, 98 S.Ct. 2265].)

■■ The trial court set forth in full its specification of reasons. The court computed the average yearly amount of Mrs. Truhitte's damages for future medical and hospital ($416.67 per year), loss of earning capacity ($811.20 per year, or $67.70 per month), and pain and suffering ($994.82 per year, or $92.90 per month), and concluded that these amounts were inadequate. The court based this finding on evidence of past expenses and losses; evidence that plaintiff faces the likelihood of continuing intermittent pain and/or further surgery; that she currently suffers pain for which no treatment is prescribed; and evidence that Mrs. Truhitte's lifestyle has been drastically changed. The specification is not inadequate under the standards cited above. ■ "In ruling on a motion for a new trial, the trial court is an independent trier of fact. '[T]he trial court may disbelieve witnesses, reweigh evidence and draw reasonable inferences that are contrary to those drawn by the jury.' [Citation.] The requirement that an abuse of discretion be manifest and unmistakable 'is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter. So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside. [Citations.]'" (*Sanchez* v. *Hasencamp* (1980) 107 Cal.App.3d 935, 944 [166 Cal.Rptr. 118]; fn. omitted.)

■■ With respect to plaintiff Maurice Truhitte, the specification of reasons states: "The last item of $3,200.00 awarded to Mr.

Truhitte for loss of his wife's companionship amounts to $106.67 for each year of the 30 years' life expectancy remaining to her. No comment should be required to point out the inadequacy of that award." While the appropriate life expectancy is the shorter, that of Mr. Truhitte, not Mrs. Truhitte, a reasonable reading of the statement in context incorporates the preceding discussion regarding Mrs. Truhitte's changed lifestyle and other matters of equal application to Mr. Truhitte's claim. The award obviously is inadequate on its face as the trial court stated.

The law vests broad discretion in the trial court to grant a new trial motion; there was no abuse of that discretion here. Unfortunately, the trial court entertained a motion for a new trial on all issues and granted a new trial on all issues (see *Richard* v. *Scott* (1978) 79 Cal.App.3d 57, 65-67 [144 Cal.Rptr. 672]) instead of on the sole issue of damages. Mrs. Truhitte has waited much too long for recompense for her suffering caused by the negligence of others. We affirm the granting of the new trial in the language of the trial court's order, but make available to the hospital, as well as to the doctor, the opportunity for additur.

The judgment notwithstanding the verdict is reversed; the judgment on the cross-complaints is reversed. The conditional order granting a new trial is affirmed in that the new trial is granted on all issues unless the doctor and the hospital consent in writing, within 30 days of the date this opinion becomes final, to an additur raising the total amount of the judgment to $125,000 and apportioning the negligence between the defendants as stated in the jury's special findings.

Zenovich, Acting P. J., and Baca, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.