693 So.2d 1195 (1997)
Max Lawrence JOHNSTON, individually and Beulah Marie Johnston, PlaintiffAppellee,
v.
SOUTHWEST LOUISIANA ASSOCIATION, d/b/a Lake Charles Memorial Hospital, Donald Hoyt Vines, M.D., and St. Paul Insurance Company, DefendantAppellant.
No. 96-1457.
Court of Appeal of Louisiana, Third Circuit.
April 2, 1997.
Rehearing Denied June 18, 1997.
*1196 Stephen Ronald Streete, Lake Charles, for Max Lawrence Johnston etc.
John Stanton Bradford, Robert W. Clements, Benjamin Joseph Guilbeau, Lake Charles, for Southwest Louisiana Association, et al.
L. Paul Foreman, Michael Keith Prudhomme, Lake Charles, for Donald H. Vines M.D., et al.
Before DOUCET, C.J., and YELVERTON and WOODARD, JJ.
YELVERTON, Judge.
A surgical gauze was left in Max Johnston's wound following a hernia operation. It stayed there from surgery in May 1992 until it was found and removed in November 1993. In his and his wife's suit for damages, a jury awarded him $281,180.04 against the surgeon, Dr. Donald Vines, and the hospital, Southwest Louisiana Association, d/b/a Lake Charles Memorial Hospital, assigning fault in proportions of 60% to the doctor, 38% to the hospital and 2% to the victim, Johnston himself. The trial judge removed the 2% by JNOV and reassigned the percentages 61% and 39% respectively. Dr. Vines appealed. We affirm.
Dr. Vines appeals the judgment based on two assignments of error. In the first assignment, *1197 Dr. Vines argues that the trial judge incorrectly charged the jury and excluded expert testimony. The second assignment seeks reversal of the trial judge's JNOV.

FACTS
On May 22, 1992, Dr. Vines performed hernia repair surgery on Johnston at Lake Charles Memorial Hospital. Dr. Vines was not employed by the hospital; however, he was assisted by two nurses who were employed by the hospital. In order to strengthen tissue and buttress the hernia repair, Dr. Vines placed a Marlex Mesh in Johnston's groin. Although the hernia surgery was seemingly successful, Johnston's incision failed to heal, evidenced by the surgical site's rejection of sutures, continuous leakage, and emission of a foul odor. Dr. Vines diagnosed the problem as a non-healing wound and opined that the Marlex Mesh, as a foreign object, might be the cause of infection. Accordingly, Dr. Vines prescribed antibiotics, and in January of 1993, Dr. Vines performed a debridement of the wound to remove all unhealthy tissue. A month later, when Dr. Vines last treated Johnston, the doctor noted that the debridement did not help and that Johnston still suffered from a "continued chronic draining sinus, meaning a hole [in the groin] with draining fluid in the wound."
After February 1993, Dr. White assumed Johnston's wound care. Like Dr. Vines, Dr. White thought the Marlex Mesh the most likely cause of the non-healing wound. Because removing the mesh would involve a complicated surgical procedure and might cause the hernia to return, Dr. White instead recommended an aggressive home health care treatment. Johnston's problem persisted. In August 1993, Dr. White surgically removed the Marlex Mesh. Still, the wound failed to heal. In November 1993, Dr. White ordered x-rays which revealed the surgical sponge. He performed surgery to remove the sponge. Johnston's wound then healed.
Initially, Johnston submitted his malpractice claim to a medical review panel that exonerated Dr. Vines of negligence and concluded that the nurses who assisted during the surgery were negligent for miscounting the sponges. Johnston then filed this malpractice suit naming Dr. Vines and the two nurses as defendants. The hospital, as the employer of the two nurses, was also named a defendant under the doctrine of respondeat superior. Johnston's wife filed a claim for loss of consortium against the same defendants. In his petition, Johnston pled application of the doctrine of res ipsa loquitur.
At trial, neither Dr. Vines nor the nurses had detailed recollection of Johnston's 1992 hernia surgery. But they testified regarding surgical procedures in general. Dr. Vines testified that in a typical surgery, such as Johnston's, he as the surgeon would have physically placed the sponge into the patient's body. The nurses are not responsible for placing sponges into the body or for removing such sponges. He further testified that the surgeon should do a visual and a manual inspection for sponges, if possible, before closing the incision.
However, Dr. Vines explained that surgeons must concentrate exclusively on the surgical procedure and hence cannot account for the sponges used during surgery, especially since the sponges in the body become camouflaged taking on the color of surrounding tissue. He argued that it is the nurses' duty and responsibility to accurately count the sponges and the surgeon must depend on that count. He explained that the hospital, not the surgeon, hires and trains the nurses; that the hospital develops the counting procedures to insure that no foreign objects are left in a patient; and that the hospital instructs the nurses on the proper counting procedures to follow during surgery.
The nurses testified as to the standard procedures followed to insure a correct sponge count. Prior to surgery, the nurses set up the instruments, sponges, and other supplies. For a hernia operation, only ten sponges would have been laid out for possible use during surgery. The nurses count the unused, sterile sponges and note on a form that sponges were counted. Later, as the surgeon completes the operation, the nurses do a second count by combining the number of unused sponges with the number of used sponges that have been removed from the patient. The total of the unused and used *1198 sponges must correspond to the number of sponges originally laid out prior to surgery; if the count does not correspond, the surgeon is notified by the nurse. The nurses complete a third count shortly before the surgeon closes the incision. If the nurses fail to account for a sponge, they report this information to the surgeon. The surgeon can then do whatever is necessary to locate that sponge before closing the incision, even x-ray the patient on the operating table. The nurses must note the results of the second and third counts on the same form where they noted the initial count.
In this case, the nurses failed to record anything concerning the second and third counts on the form. After Johnston's surgery, Dr. Vines completed an "operative report" in which he stated that the nurse reported to him, before closing, that the sponge count was correct and verified. We do not know the precise number of sponges used during Johnston's hernia surgery. Apparently, Dr. Vines used no more than ten sponges and as few as one sponge.

OPINION

I. Jury Instructions and Exclusion of Expert Testimony
Even without expert testimony establishing the standard of care, we know that some person or persons must have been negligent in this case. Under the doctrine of res ipsa loquitur, we may infer negligence from the mere fact that a surgical sponge does not ordinarily remain in the patient's body without the commission of medical negligence. See Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986). Regarding a surgeon's negligence, the supreme court gave the following explanation:
When a physician does an obviously negligent act, such as fracturing a leg during an examination; amputating the wrong arm; carelessly dropping a knife, scalpel, or acid on the patient; or leaving a sponge in a patient's body, lay persons can infer negligence.
Id. at 719.
While Dr. Vines does not dispute that a sponge was negligently left in Johnston's body, he argues that it was entirely the nurses' negligence in miscounting that caused Johnston's injury. He further argues that the trial judge erred in excluding the expert testimony of Dr. McCalla regarding the applicable standard of care. Dr. McCalla would have testified that nurses have the sole responsibility for the sponge count and that the national standard of care recognizes the surgeon's justifiable reliance upon the nurse's count. Dr. McCalla would have concluded, as did the medical review panel, that Dr. Vines did not violate this national standard of care applicable to surgeons and, hence, could bear no personal liability for Johnston's injuries; instead, the nurses and their employer, the hospital, were solely liable for the nurses' negligence.
While we recognize that the nurses have an independent duty, apart from the surgeon's duty, to account for the sponges and that they can be concurrently at fault with the surgeon for leaving a sponge in the patient's body, we disagree with Dr. Vines' assertion that the nurses have the sole duty to account for all sponges and that the surgeon discharges his duty by reasonably relying on their sponge count. We think this argument contrary to common sense: after all, Dr. Vines had exclusive control over the sponge from the time he physically placed it inside his patient until he removed it. We think, as did the trial judge, that the nurses' count is a remedial measure that cannot relieve the surgeon of his nondelegable duty to remove the sponge in the first instance.
Dr. Vines argument is also contrary to the prevailing case law that establishes the surgeon's nondelegable duty to remove all sponges placed in a patient's body and holds that the surgeon's violation of this duty is negligence per se. Grant v. Touro Infirmary, 254 La. 204, 223 So.2d 148 (1969); Guilbeau v. St. Paul Fire & Marine Insurance Co., 325 So.2d 395 (La.App. 3 Cir.1975), writ denied, 329 So.2d 454 (La.1976). In Grant, 223 So.2d at 154-155, the supreme court considered facts similar to our present case and concluded that the operating surgeon was personally negligent:
The general rule, as stated in 70 C.J.S. Physicians and Surgeons § 48, p. 969, is *1199 that a surgeon's failure to remove a sponge or pad before closing an incision may be regarded as negligence per se, and some authorities hold that the surgeon cannot relieve himself from liability for injury to a patient caused by leaving sponges or pads by reliance on a custom or rule requiring the attending nurse to count sponges or pads used and removed, and on the nurse's statement as to the count.
Albeit there is authority to the contrary, we are convinced that the general rule is sound. While the nurses of Touro were unquestionably negligent in making an incorrect count of the sponges withdrawn from Mrs. Grant's body, which was the proximate cause of the accident, we hold that Dr. Golden was guilty of concurrent fault in failing to notice that one of the holders he withdrew from Mrs. Grant's body did not have a sponge attached.
We conclude that Dr. Vines, like the surgeon in Grant, was personally negligent for failing to remove the sponge that he placed inside Johnston and that he could not relieve himself of his duty by pointing the finger at the nurses. We note that courts in other states have reached this same conclusion in fairly recent cases. See Rudeck v. Wright, 218 Mont. 41, 709 P.2d 621 (1985); Truhitte v. French Hospital, 128 Cal.App.3d 332, 180 Cal.Rptr. 152 (1982, 5th Dist.); Ravi v. Williams, 536 So.2d 1374 (Ala.1988). Thus, the trial judge correctly excluded the testimony of Dr. McCalla since the only purpose of this expert testimony was to completely shift the responsibility for the sponge's removal from the surgeon to the nurses. Such testimony would have been contrary to Louisiana law and it was properly excluded.
The above discussion also defeats Dr. Vines argument that the following statements taken from the jury charge were flawed and misleading:
Expert testimony is not required where the physician does an obviously careless act, such as leaving a sponge in a patient's body, from which a lay person can infer negligence. The fact that he complied with the medical practice of relying on a nurse's sponge count, if any, does not exonerate him.
These two statements accurately paraphrase the principles set forth in the two Louisiana Supreme Court cases discussed above, Hastings and Grant. They are correct statements of the law, and, as such, the trial judge correctly included them in his jury charge.
Additionally, Dr. Vines argues that the jury instructions were flawed because they adopted the "captain of the ship" doctrine that improperly allowed the jury to find Dr. Vines vicariously liable for the nurses' negligence in miscounting the sponges. That is not necessarily so. Considering the jury instructions as a whole, it is more likely that the jury's allocation of 60% fault to Dr. Vines was based entirely on a finding that the doctor was personally negligent, not on a finding of vicarious liability. Such a jury finding would be reasonable and obviate our need to discuss the possible imposition of vicarious liability due to faulty jury instructions. Nevertheless, we feel compelled to address this issue since Dr. Vines' argues it so forcefully.
The "captain of the ship" doctrine developed at a time when hospitals were afforded charitable immunity and shielded from liability flowing from their own employees' negligence. Courts thus began to hold surgeons vicariously liable for all negligent acts committed by hospital employees during the treatment of that surgeon's patient. The imposition of vicarious liability rested on the theory that the hospital's employees became the surgeon's borrowed servants during surgery. However, this liability was based on the surgeon's status as opposed to the surgeon's actual control over the particular employee. See Parmelee v. Kline, 579 So.2d 1008 (La.App. 5 Cir.1991).
In Grant, 254 La. 204, 223 So.2d 148, the supreme court severely limited the "captain of the ship" doctrine by rejecting the blanket imposition of vicarious liability upon the surgeon for the nurses' negligent sponge count. (As discussed above, the court did recognize the surgeon's personal negligence for failure to remove the sponge.) The nurses in Grant, like the nurses in this case, were employees of the hospital. In determining whether the nurses were the surgeon's borrowed servants, *1200 the court focused on the surgeon's actual control and rejected liability based only on status:
While it is the general rule that the surgeon is in charge of all personnel in the operating room during the performance of the operation, we do not feel the evidence justifies the conclusion that, under modern medical operative procedures, it can be said that the borrowed servant doctrine applies in this case. For it is shown by the record that operations performed under modern techniques require team performance, and the nurses and other personnel assisting in the operating room are not at all times under the immediate supervision and control of the operating surgeon so as to bring the case strictly within the borrowed servant doctrine.
Id. 223 So.2d at 154.
In the present case, the specific excerpt that Dr. Vines quotes in his brief and objects to as an improper "captain of the ship" jury instruction reads as follows:
It is the general rule that in the operating room the surgeon who is in charge of an operation has exclusive responsibility and control, he is responsible for any acts of negligence committed during the operation by himself, his assistants or his servants.
When the jury heard that instruction the presiding judge had just finished telling them to consider what he said about the law as a whole, and not to single out any one sentence, or individual point, and ignore the others. Abiding by this instruction, the jury would have listened to the remainder of the paragraph from which the above excerpt was plucked. The remainder of that paragraph reads as follows:
This responsibility extends to his customary and normal employees, and may also extend to those employees which you find from the evidence he has borrowed and are under his control at the time of the incident in question. Whether or not a person is employed by the physician, as a regular employee or as a borrowed employee, is a question of fact that you must determine.
(Emphasis provided.)
The above portion of the jury charge appears to restate the quotation from the Grant case that rejected a blanket imposition of vicarious liability upon the surgeon for the nurses' negligence. In other words, the trial judge made it clear that vicarious liability must be based on the surgeon's control of the hospital's employee, not merely on his status. This instruction conformed to the law and was proper.

II. Mitigation of Damages
Although the jury apportioned Johnston 2% of the fault, the trial judge granted Johnston's motion for a JNOV and thereby removed Johnston's percentage of fault. Dr. Vines argues on appeal that the jury's fault allocation should be reinstated and that Johnston's fault percentage should even be increased to 47%.
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. Anderson v. New Orleans Public Service, 583 So.2d 829 (La. 1991). When the wound failed to heal, Dr. Vines became concerned and thought that Johnston might have an underlying cancer of the colon or rectum which prevented the wound from healing. The doctor recommended a sigmoidoscopy to check the colon and rectum. This is an invasive procedure. This test would have included an x-ray that might have detected the sponge in Johnston's groin. Johnston refused this test, and this refusal is the main reason that failure to mitigate is argued. We note that the purpose for this test would not have been to look for a missing sponge, which was there, but to look for a cancer, which was not there. We agree with the trial judge that it is unreasonable to assign fault to Johnston on these facts.
All along, Dr. Vines admitted that he never suspected a sponge as the source of Johnston's problems nor had he discussed such a possibility with Johnston. Both Dr. Vines and Dr. White suspected that the Marlex *1201 Mesh, which was also a foreign object in Johnston's groin, prevented the healing. The record reflects that Johnston fully cooperated with all the doctors and other medical professionals who treated him. He followed all their instructions concerning the care of his wound. He agreed to the debridement recommended by Dr. Vines and the subsequent surgeries by Dr. White to remove the Marlex Mesh and then the sponge. Dr. Vines never said to Johnston, "I suspect a sponge was left in the wound; we must x-ray the sight to determine if one is there." If Johnston had refused this hypothetical recommendation, then some assignment of fault might not be unreasonable. Considering what actually happened in this case, however, we conclude that the trial judge was correct in ordering the JNOV.
For these reasons the judgment is affirmed at appellant's costs.
AFFIRMED.