# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CA-00063-SCT

*DORETHA THOMPSON*

*v.*

*BAPTIST MEMORIAL HOSPITAL-DeSOTO, INC.*
*AND JAMES E. FORTUNE, M.D.*


| | |
|---|---|
| DATE OF JUDGMENT: | 07/29/2015 |
| TRIAL JUDGE: | HON. GERALD W. CHATHAM, SR. |
| TRIAL COURT ATTORNEYS: | BRANDON ISAAC DORSEY |
| | KEVIN O'NEAL BASKETTE |
| | WALTER ALAN DAVIS |
| | SARAH KATHERINE EMBRY |
| | ALBERT C. HARVEY |
| COURT FROM WHICH APPEALED: | DeSOTO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | BRANDON ISAAC DORSEY |
| ATTORNEYS FOR APPELLEES: | WALTER ALAN DAVIS |
| | KEVIN O'NEAL BASKETTE |
| | ALBERT C. HARVEY |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND REMANDED - 04/26/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., KITCHENS, P.J., AND BEAM, J.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1. Doretha Thompson appeals from the DeSoto County Circuit Court's judgment on a jury verdict in favor of the defendants, Baptist Memorial Hospital DeSoto, Inc. (BMH-D), and James Fortune, M.D., in a medical malpractice case. A surgical sponge inadvertently was left inside Thompson's abdomen during an operation performed by Dr. Fortune to remove Thompson's gallbladder in 2004. The sponge was not discovered until 2011, when

Thompson presented to the emergency room in Bolivar County complaining of stomach pains.

¶2. Dr. Fortune admitted at trial that the sponge inadvertently had been left in Thompson's abdomen during the 2004 operation. And he admitted the sponge was the cause of Thompson's 2011 injury and complications. But Dr. Fortune claimed he did not deviate from the applicable standard of care, which he contended did not require him to count or keep track of the number of surgical sponges used in the operation, but which allowed him to rely on an accurate sponge count conducted by a nurse and scrub technician assisting in the 2004 procedure, both of whom were employed by BMH-D. All parties provided expert testimony in support of their respective cases.

¶3. This appeal followed, with numerous issues raised by Thompson. The only one we find that has merit is Thompson's claim the jury was not properly instructed on the law in this case. As will be explained, this constituted reversible error, and Thompson is entitled to a new trial against both defendants.

**FACTS**

¶4. In June 2004, Dr. Fortune performed a cholecystectomy on Thompson at BMH-D, to remove her gallbladder. Dr. Fortune had intended to perform a less-invasive laparoscopic procedure, but the inflamation around Thompson's gallbladder was too great. So Dr. Fortune converted the procedure to an open operation, having informed Thompson beforehand this might be necessary. The surgery lasted approximately ninety-five minutes, and Dr. Fortune

successfully removed Thompson's gallbladder. But a four-by-four-inch "ray-tec" surgical sponge was left in Thompson's abdomen by mistake.

¶5.    Shortly after surgery, Thompson developed an abscess, along with fluid collection in her abdomen. She displayed an elevated white blood cell count and a decreased hematocrit level. Dr. Fortune became concerned, so he ordered a CT scan of the abdomen. He said that, while such a scenario is not uncommon, he wanted to ensure there was nothing that he needed to attend to in the abdomen or in the surgical field, "[and] to see if there's any infection, any fluid, whether that be a hematoma with bleeding or whether that be inflammatory fluid or whether inflammatory fluid has become infected or forming an abscess or whether there's any fluid there from a bile leak."

¶6.    Dr. Fortune asked Mid-South Imaging and Therapeutics (MSIT) to perform a CT scan of Thompson's abdomen. A scan was conducted, and MSIT made a report to Dr. Fortune. Dr. Fortune said the report noted "fluid collection in the gallbladder fossa." Dr. Fortune indicated that he did not review the CT scan(s).

¶7.    Dr. Fortune then consulted with a "interventional radiologist" employed by MSIT to drain the fluid. The radiologist performed a "fluid gallbladder fossa" by placing a drain inside Thompson's abdomen by "CT guidance," which drained and cultured the fluid.

¶8.    Dr. Fortune was asked on direct examination whether he had been there for the procedure. Dr. Fortune stated: "No, sir. Basically, [the interventional radiologist] doesn't come into surgery with my expertise, and I don't go into his expertise there because I'm not qualified to do so. That's his expertise."

3

¶9. After MSIT performed the procedure, Dr. Fortune read the report, which said the area was drained successfully and indicated no other problems in Thompson's abdomen other than the fluid. Thompson's white blood cell count returned to normal, and Thompson continued "a more usual postoperative course . . . ." Dr. Fortune discharged Thompson from the hospital on July 6, 2004.

¶10. Thompson testified that for years afterward, she experienced intermittent abdominal pain, which she treated herself with over-the-counter medications. In November 2011, Thompson went to the emergency room at Bolivar County Medical Center complaining of abdominal pain on the right side of her abdomen. An abdominal scan detected a "foreign body" inside Thompson's abdomen. Doctors suspected it was a surgical sponge from the 2004 gallbladder surgery. Bolivar County Medical Center transferred Thompson to BMH-D for further care.

¶11. On November 21, 2011, Dr. Fortune performed another open operation on Thompson to retrieve and remove the sponge. After locating and removing the sponge, Dr. Fortune found a "pin-size communication of fistula to the first portion of the duodenum[, along] with associated abscess." Dr. Fortune said this injury was caused by the sponge. In his opinion, the "hole" created by the sponge most likely developed shortly before Thompson reported to the emergency room in Bolivar County in 2011. Dr. Fortune explained that when a "hole" like that is established, "acid that accumulates in the stomach and duodenum, leak[s through causing] immediate and severe symptoms, burning symptoms or symptoms related to the acid like if you drop acid on your skin or anything, it hurts."

4

¶12. Dr. Fortune irrigated the area with saline and antibiotic solution. He treated the "fistula" caused by the sponge with medication used to treat ulcers, gastritis, or duodenitis. In Dr. Fortune's opinion, this treatment successfully healed Thompson's injury.

¶13. Evidence was presented that, after removal of the sponge, Thompson reported to the emergency room at Bolivar County Medical Center on at least eight occasions between 2012 and 2014. An April 2014 medical report stated: "Subjectively, the patient has a long history of abdominal pain, intermittent abdominal pain since the removal of the foreign body. Comes in this time diarrhea, nausea, vomiting, abdominal pain localized to the right upper quadrant."

¶14. In July 2014, Thompson was evaluated at Bolivar County Medical Center and transferred to the University of Mississippi Medical Center (UMMC) in Jackson, Mississippi, for further evaluation, where she was diagnosed with duodenitis. Thompson returned to UMMC in September 2014 for a follow-up examination, at which point the "duodenitis ha[d] resolved." Thompson was instructed to continue taking "antiacid medications and [to] come back if her symptoms returned."

**Thompson's Expert Witness**

¶15. At trial, Thompson presented expert testimony from Kenneth Larson, M.D., a general surgeon on staff at JFK Medical Center in West Palm Beach, Florida. Dr. Larson testified that Dr. Fortune had deviated from the applicable standard of care and was responsible for the surgical sponge being left in Thompson's abdomen. Dr. Larson said that if a surgeon is being careful and prudent during surgery, he or she will know what he or she is putting into

5

the abdomen: "which instruments you're using, and when you're no longer in need of those instruments or those sponges, you're going to remove exactly as many sponges in this case as you put in." Dr. Larson said a surgeon has to have "situational awareness of that during the surgery."

¶16. Speaking to this particular case, Dr. Larson said Dr. Fortune properly converted the laparoscopic procedure to open surgery given the amount of inflammation surrounding the gallbladder. This allowed Dr. Fortune to push more tissue apart and to see more of the anatomy in order to complete the operation successfully. Dr. Larson opined that a surgeon such as Dr. Fortune is not expected to write down the number of sponges used, "like the nurse might," but the surgeon has a responsibility to be aware of how many sponges he is using, as he is the one ultimately in control of the equipment used, including the sponges.

¶17. When asked what Dr. Fortune was supposed to do once told by the nurse the sponge count was correct, Dr. Larson replied: "Well, this is getting off onto the issue that you raised. I mean there's more than one person responsible here. Ultimately, the surgeon is the one who has the ultimate responsibility for making sure that they don't leave their own surgical equipment that they put into the abdomen."

¶18. Dr. Larson said, "[t]he surgeon is not allowed to solely rely on the count provided by the nurses. That would be below the standard of care." Dr. Larson further testified that in his opinion, the retained sponge not only caused the 2011 injury, but it likely contributed to Thompson's subsequent presentations to Bolivar County Medical Center and UMMC in 2012, 2013, and 2014.

6

**Surgical Report from the 2004 Procedure**

¶19. A surgical report presented at trial shows that the 2004 procedure began at 5:05 p.m. and concluded at 6:30 p.m. Those present in the operating room during the surgery were Dr. Fortune; nurse anesthetist Larry Reed, C.R.N.A.; circulating nurse Andrea Johnson, R.N.; scrub technician Chris Lee, R.N.; and scrub technician/surgical assistant Marritta Polk. Also present in the operating room was circulating nurse Theresa Buckhalter, R.N., who entered the operating room at 6:10 p.m. to relieve Johnson. All those assisting Dr. Fortune were BMH-D employees.

¶20. According to the 2004 surgical report, Dr. Fortune arrived in the operating room at 5:00 p.m and left at 6:35 p.m.; Reed, 4:34 p.m. to 6:40 p.m.; Lee, 4:00 p.m. to 6:40 p.m.; Johnson, 4:34 p.m. to 6:10 p.m.; Polk, 4:30 p.m. to 6:40 p.m.; and Buckhalter, 6:10 p.m. to 6:45 p.m.

**Johnson's Testimony**

¶21. At trial, Johnson was called by Thompson to testify. Johnson was the only person, besides Dr. Fortune, present at the 2004 operation who provided testimony in this case.

¶22. Johnson testified to the general responsibilities of a circulating nurse for surgical procedures. She said a circulating nurse is responsible for all nonsterile aspects of a surgery, such as prepping the surgical instruments and supplies, helping with all the documentation in the case, and assisting with the patient before and after surgery. This includes bringing the surgical instruments and supplies into the operating room and getting them to the scrub technician in a sterile fashion. Johnson said they do an instrument count and a sponge count

7

as necessary for each particular case. She said not all surgeries require sponge counts, but open operations involving the abdominal cavity always do because you are "entering into a large cavity."

¶23. Johnson said in a case such as this one, which initially was scheduled as a laparoscopic procedure, sponges would have been prepared for use beforehand because such procedures tend to convert to open operations. Johnson said both she and the scrub technician would have been responsible for the sponge count, which would have been conducted prior to surgery.

¶24. Johnson could not recall offhand the specifics of Thompson's 2004 surgery nor how many surgical sponges were used for that surgery. She said the sponge count sheet used to keep track of the sponge count was not retained with Thompson's medical records, since that was "not our standard practice to keep the actual sponge count sheets on the record."

¶25. Reading from the 2004 surgical report during her testimony, Johnson acknowledged a particular field contained in the report that read: "Initial count by[;] Relief count by[;] Closing count by[;] Final count by[.]" The field contained two sets of initials, Johnson's and Lee's, for each category, with the exception of the relief-count of the category, which was left blank. Johnson said this indicates to her that the sponge count was completed before she was relieved by Buckhalter, and it was unnecessary to do a relief count.

¶26. Johnson said if there is a discrepancy in the count, an x-ray is taken. Each sponge contains blue strips with "x-ray filaments in them" so they can be seen on x-ray. Johnson said if an x-ray was taken, she would speak to the radiologist who would inform her whether

a sponge was detected. If anything was detected, she would inform the surgeon. If nothing was detected, she also would inform the surgeon, who would then continue to close the procedure.

¶27. Johnson said if the sponge count(s) show a discrepancy, they "addressograph those count sheets" and fill out a risk-management form which goes to risk management. According to Johnson, such information still would not go into the patient's chart.

### Dr. Fortune's Testimony

¶28. In reference to the 2004 procedure, Dr. Fortune testified that Polk would have been on the opposite side of the surgical table facing and assisting him. The scrub technician handling the surgical tools and sponges would have been standing immediately to either Dr. Fortune's right or left side. Dr. Fortune said an assistant, such as Polk, may from "time to time" place and remove sponges during an operation, but the surgeon places and removes the sponges the majority of the time. Dr. Fortune could not recall whether Polk inserted any surgical sponges inside Thompson's abdomen.

¶29. Dr. Fortune said he would not, "except for extreme situations leave sponges in the abdomen." He would, however, purposely leave items such as surgical clips and "Surgicels"[1] inside a patient, and did so for Thompson's 2004 surgery. Dr. Fortune explained that in a gallbladder removal, surgical clips are used "after you dissect out and isolate the cystic duct, . . . where it joins the common duct, [and] the cystic artery, . . . where it joins the hepatic artery[;] you put clips on those two structures, two usually, two to three [on] the retained side,

---

[1] A bioabsorbable mesh.

9

one on the gallbladder side, and then cut those, and then dissect the gallbladder out of the gallbladder bed."

¶30. He said metal surgical clips were used in the 2004 surgery. Dr. Fortune explained that the body has an inflammatory reaction to a foreign object left in the body, such as a surgical clip, which should taper off in the months following an operation. He said the body "winds up isolating and walling off that object to a varied degree."

¶31. Dr. Fortune said that after he removed Thompson's gallbladder, he first visually inspected the surgical field for sponges. Next, he felt around the area with his hands and relied upon the circulating nurse and the surgical technician to tell him verbally there was "a correct sponge count, lap count, needle count, and instrument count."

¶32. Dr. Fortune said if a sponge count is not correct, he immediately stops the procedure and does not continue until the missing object is discovered. He first visually inspects the area. Then he feels around some more, careful not to do any harm in that exercise. At the same time, the surgical team looks around areas on and around the surgical table, and around the room. Dr. Fortune said, "If it's not found by that search, then I do an x-ray."

¶33. When asked if he agreed with Dr. Larson's testimony that a physician should be able to recall every sponge that is placed in a patient, Dr. Fortune said he disagreed. He stated: "I can't do that. I'm focused on the operation, what I need to do to successfully complete the operation, and I can't keep in my head the issue of sponges and laps. I have to depend upon the . . . surgical team in the room to do that."

10

¶34.    Following the 2004 procedure, after Thompson was discharged from the hospital, Dr. Fortune said he saw Thompson a couple of times in July 2004 for follow-up examinations, at which point he removed her staples.  He found that Thompson was progressing well, and he sent a report to Thompson's primary-care physician.

¶35.    Dr. Fortune did not see or hear from Thompson again until November 2011, when a physician at Bolivar County Medical Center called Dr. Fortune to advise that a foreign body had been detected on an x-ray taken of Thompson's abdomen.  Dr. Fortune had Thompson transferred to BMH-D, where another CT scan was performed by MSIT.

¶36.    Dr. Fortune said the MSIT radiologist called him afterward and said they had found a foreign body inside Thompson's abdomen, and their impression was that it probably was a sponge.  According to Dr. Fortune, the radiologist also told him they had reviewed the interventional films from 2004, and a sponge was visible on those films as well.  Neither the radiologist nor the 2004 films were presented at trial in the instant matter.  And Dr. Fortune testified he never saw the 2004 films himself.

¶37.    In the 2011 operation, Dr. Fortune reopened Thompson's 2004 incision and exposed the same operative field seen in 2004.  Unable to see the sponge inside the surgical field, Dr. Fortune then used an "image intensifier," which projects an x-ray image unto a television monitor.  While viewing the sponge on the monitor, Dr. Thompson used a "sponge stick" to probe for the sponge, but still could not pinpoint its location.  He then probed an area known as the "lesser sac" and found the sponge.

11

¶38. Dr. Fortune told the jury the lesser sac is a "blind sac or pouch, . . . that is formed by the lesser omentum, which is a fatty veil between the liver and the stomach . . . ." He said, "[w]hen you're looking down on it, it[] just looks like a veil. You can't see into it." There is only "one opening to that pouch, which is directly behind the common duct."

¶39. In Dr. Fortune's opinion, the sponge likely got to that location during the 2004 operation, when they were trying to "expose [another] area and move the sponges and laps around that were helping to expose that area and the retractors with it." And the sponge inadvertently was pushed "into the lesser sac through the foramen of Winslow, which is the opening [of] that lesser sac, which is right below the common duct."

**Dr. Fortune's and BMH-D's Experts**

¶40. Dr. Fortune presented testimony from two surgical experts, Dr. Martin Fleming and Dr. Scott Berry, both general surgeons. BMH-D presented expert testimony from Dr. Guy Russell Voeller, a general surgeon who practices in Memphis, Tennessee, and in Mississippi.

¶41. Drs. Fleming and Berry both testified that the standard of care practiced by members of the medical profession allows for the operating surgeon to rely on accurate sponge counts from others assisting in the operation. They both explained why that is necessary. Dr. Voeller provided similar testimony.

¶42. Additional facts will be related in the analysis as necessary.

**ANALYSIS**

**Whether the trial court erred in refusing Thompson's jury instructions: P-1 and P-2.**

¶43. Thompson contends the trial court erred in refusing the following jury instructions:

12

JURY INSTRUCTION P - 1

If you find from a preponderance of the evidence that a sponge was left inside of the abdomen of the Plaintiff . . . by [Dr. Fortune,] then a presumption of negligence is raised that must be rebutted by [Dr. Fortune.] If you find that [Dr. Fortune] fails to rebut the presumption, and that the failure to remove the sponge was the sole proximate cause or proximate contributing cause of [Thompson's] injury, then you shall find in favor of [Thompson].

JURY INSTRUCTION P - 2

If you find from the preponderance of the evidence that the explanation offered by Dr. Fortune regarding how the sponge was retained inside of the abdomen of [Thompson] was not reasonable, and that the failure to remove the sponge was the sole proximate cause or proximate contributing cause of [Thompson's] injury then you shall find for [Thompson].

¶44.    The trial court refused these jury instructions based on arguments from Dr. Fortune and BMH-D that both constituted, or were related to, *res ipsa loquitur* instructions and thus were improper pursuant to **Winters v. Wright**, 869 So. 2d 357 (Miss. 2003). Relying on **Winters**, the defendants argued that, since Thompson had established a prima facie case for negligence, primarily through expert testimony evidence, any jury instruction as to *res ipsa loquitur* was inappropriate. The defendants further contended that *res ipsa* doctrine merely allows for a inference of negligence; it does not require such an inference or a finding of negligence, and it does not shift the burden of proof from the plaintiff to the defendant.

¶45.    We disagree with the defendants that these instruction were improper. Each correctly states the law that governs in this case, and the trial court erred in refusing them.

¶46.    More than a century ago, this Court held that: "Unexplained, the leaving of a [surgical apparatus] in a patient's body by a physician is negligence[.]" **Saucier v. Ross**, 112 Miss. 306, 73 So. 49, 50 (1916). This is long-settled substantive law in Mississippi, and Thompson

13

was entitled to have the jury instructed accordingly based on the facts of the case. We explain.

¶47. At the outset, Dr. Fortune and BMH-D are correct that under Mississippi's traditional *res ipsa loquitur* doctrine, a defendant may avoid a judgment even if he chooses to present no evidence to rebut the plaintiff's claim, given that, under traditional, common law *res ipsa*, the jury is allowed to infer negligence but it is not bound to make the inference of negligence. *See* **Read v. Southern Pine Elec. Power Ass'n**, 515 So. 2d 920 (Miss. 1987).

¶48. This is because *res ipsa* generally is regarded as an evidentiary rule, not a rule of substantive law. **Johnson v. Foster**, 202 So. 2d 520, 524-25 (Miss. 1967). The **Johnson** Court noted that in applying the rule, courts sometimes fail to make or recognize a distinction between "a presumption and a permissible inference." **Id**. at 524 (citing as example **Alabama & Vicksburg Ry. Co. v. Groome**, 97 Miss. 201, 52 So. 703 (1910)). **Johnson** said:

> A true presumption is a rule of substantive law which compels a certain conclusion, usually a judgment, absent rebutting evidence. See 9 Wigmore, Evidence § 2491 (3d ed. 1940). On the other hand, res ipsa loquitur is a rule of circumstantial evidence from which the jury is entitled to draw an inference of the defendant's negligence. This is usually a permissible inference, however, and the jury is not bound to infer negligence even where there is no rebutting evidence.

**Id**.

¶49.   *Winters* (a four-justice plurality opinion),[2] relied upon here by the defendants, applied this precept to the facts of that case.  In *Winters*, the plaintiff sued for injuries to her lower extremities she claimed resulted from a heating blanket used during surgery to repair injuries to her abdomen resulting from a gunshot accident.  *Id*. at 359-60.  Prior to trial, the plaintiff settled her claim against the blanket's manufacturer and thereafter proceeded to trial against the remaining defendants: the surgeon who repaired the plaintiff's gunshot wounds, the surgeon's clinic, and the hospital where the surgery was performed.  *Id*. at 360.  The jury returned a verdict in favor of all the defendants.  *Id*.  The plaintiff appealed claiming, *inter alia*, the trial court erred in denying her request for a *res ipsa* instruction.  *Id*. at 362.

¶50.   The *Winters* plurality held that the trial court did not err in denying a *res ipsa* instruction.  *Id*. at 365.  The plurality found that two alternate theories for the cause of the plaintiff's injury were presented to the jury at trial.  *Id*.  The plaintiff put forth evidence that the injury to her leg was a burn that had resulted from the heating pad used during surgery. *Id*.  The defendants, however, put forth evidence that the injury was not a burn, but was dead tissue resulting from loss of blood circulation from the surgeon's clamping the plaintiff's aorta during surgery to stop blood loss.  *Id*.  Construing the doctrine of *res ipsa* with the facts of the case, the *Winters* plurality summarily stated,  "When both sides to a dispute have put

_____

[2] Presiding Justice Smith authored the plurality opinion.  He was joined by Justices Waller, Cobb, and Carlson.  Justice Easley dissented without opinion.  Chief Justice Pittman dissented with separate opinion joined by Justice Graves, joined in part by Presiding Justice McRae.   Justice McRae also dissented with separate opinion.   Justice Diaz did not participate.  *Winters*, 869 So. 2d at 370-71.

15

forth evidence, we find that the issue is a fact question for the jury, and thus a *res ipsa loquitur* instruction is inappropriate." *Id*. at 364.

¶51. In reaching its conclusion, the *Winters* plurality quoted extensively from *DeLaughter v. Womack*, 250 Miss. 190, 164 So. 2d 762 (1964), *overruled on other grounds by Hall v. Hilbun*, 466 So. 2d 856 (Miss. 1985).

¶52. In *DeLaughter*, a nurse administered a penicillin shot to a young child, as instructed by the doctor. *DeLaughter*, 164 So. 2d at 764. Over the next few days, the child reported back with various problems, which the doctors were unable to diagnose. Ultimately, the child lost his toes and skin off his foot, as a result of gangrene. *Id*. The child, through his mother, filed suit claiming the nurse was negligent in giving the injection, and that the doctors were negligent in diagnosing and treating the problem. *Id*. The doctors and the nurse contended at trial that the child suffered from an unusual allergic reaction to the penicillin, which resulted in the loss of his toes and part of his foot. *Id*. at 766. The case was submitted to a jury, resulting in a verdict in favor of the defendants. *Id*. at 764. The plaintiffs appealed to this Court, which reversed the judgment and remanded the case for a new trial based on a number of jury instructions this Court found were granted erroneously by the trial court on behalf of the defendants.

¶53. The plaintiffs also claimed on appeal in *DeLaughter* that the trial court had erred in not allowing a *res ipsa* instruction. The *DeLaughter* Court disagreed with the plaintiffs on that issue, and explained as follows:

> In the case now before us, all of the facts have been presented in evidence.
> The plaintiff made out a prima facie case of negligence. The cause of the

16

injury is shown to have been an injection of penicillin. The results and circumstances are such as would warrant a jury in finding that the penicillin injection was negligently administered intravenously. On the other hand the defendants have shown that the nurse was competent and skilled, and the child was suffering with a peculiar allergy. Both questions are for the jury's determination . . . . All the facts are before the jury. **There is no room for presumptions. All of the inferences are swallowed up in the known facts and circumstances, making up the issue for the determination of the jury.** The doctrine of res ipsa loquitur should be applied cautiously, and in this case we have reached the conclusion that the doctrine should not have been applied. There is no necessity to apply the doctrine in the instant case, because the plaintiff made out a prima facie case of negligence, which, in any case, required the defendants to go forward with the evidence. 38 Am. Jur., Negligence, § 289, p. 981. The doctrine does not apply where there is direct evidence as to the precise cause. 38 Am. Jur. § 296, p. 992, *supra*.

*Id*. at 771 (emphasis added). The ***Winters*** plurality quoted this same language from ***DeLaughter*** in reaching its conclusion that a *res ipsa* instruction was inappropriate in the case because evidence had been presented from both sides on the question of negligence.

¶54. The case here though is different from ***Winters*** and ***DeLaughter***. As Thompson correctly points out, the rule first announced in ***Saucier, supra***, and reaffirmed by this Court in ***Long v. Sledge***, 209 So. 2d 814 (Miss. 1968), and in ***Coleman v. Rice***, 706 So. 2d 696 (Miss. 1997), governs.

¶55. In ***Saucier***, the plaintiff sued a surgeon claiming the surgeon had negligently left a four-inch rubber tube in her body following an operation. ***Saucier***, 73 So. at 50. At trial, the trial court excluded the plaintiff's evidence and directed a judgment for the defendant surgeon. ***Id***. This Court reversed the trial court, holding as follows:

This was error. Unexplained, the leaving of a four-inch rubber tube in a patient's body by a physician is negligence, and it occurs to us that it would be very difficult for a physician to explain how he could leave a rubber tube in a

17

patient's body, until the wound healed over same, and not be guilty of negligence in the treatment of his patient.

It is no answer to plaintiff's suit that the rubber tube may have been left in her wound by an attendant nurse or another physician in the hospital. She testified that Dr. Ross was her physician and operated on her and attended her while in the hospital, and that the other physicians were acting under his directions in the treatment of her, and that he discharged her from the hospital at the time she left.

*Id*. *Saucier* remanded the case to the trial court.

¶56.   In *Long*, the plaintiff sued a hospital and two surgeons for leaving an eight-inch, scissors-shaped hemostat inside the plaintiff during a hernia operation. *Long*, 209 So. 2d at 815-16.  The case went to trial, during which a nonsuit was taken by the plaintiff as to the hospital.  *Id*. at 816.  At the conclusion of testimony, the plaintiff requested a peremptory instruction on the question of liability, which the trial court denied. *Id*.  The case went to the jury, which returned a verdict in favor of the doctors.  *Id*.

¶57.   The plaintiff thereafter filed a motion for a judgment notwithstanding the verdict (JNOV), and a motion for a new trial.  *Id*.  The trial judge granted the plaintiff a JNOV, stating for the record that it was the judge's opinion that he had erred in failing to grant a peremptory instruction against the defendants on the question of liability.  *Id*.  Another trial was had on the question of damages, and the jury returned a damages award in favor of the plaintiff.  *Id*.

¶58.   The defendants appealed, claiming the trial court had erred in granting a JNOV in favor of the plaintiff.  *Id*. at 819.  This Court affirmed the trial court's decision.

18

¶59. ***Long*** first noted the general standard of malpractice liability in Mississippi: "Malpractice liability may result either through lack of skill or neglect to apply it, if possessed. The two are separate, distinct basis [sic] of liability." ***Id***. at 817 (quoting ***Newport v. Hyde***, 244 Miss. 870, 875, 147 So. 2d 113, 115 (1962)).

¶60. ***Long*** then stated: "However, in cases where the alleged malpractice involves the leaving of a foreign object . . . in the patient's body by a surgeon, . . . the rule first announced by this Court in ***Saucier*** [applies]."

> Unexplained, the leaving of a four-inch rubber tube in a patient's body by a physician is negligence, and it occurs to us that it would be very difficult for a physician to explain how he could leave a rubber tube in a patient's body, until the wound healed over same, and not be guilty of negligence in the treatment of his patient.

***Id***. at 817-18 (quoting ***Saucier***, 112 Miss. at 314, 73 So. at 50).

¶61. Applying the ***Saucier*** rule to the facts of the case, ***Long*** found that the defendants had admitted leaving the hemostat in the plaintiff's body, but they sought to avoid liability "by what amounts to a plea of confession and avoidance in that they were confronted with a sudden emergency during the course of the operation, which emergency caused them to leave the hemostat in [the patient's] body." ***Id***. at 818. ***Long*** explained that "[u]nder this plea, appellants assumed the burden of proof of the sudden emergency and that it was of such nature to exculpate them from negligence." ***Id***.

¶62. Construing the evidence, ***Long*** said "there is a serious question whether the sudden emergency doctrine has any application under the facts of this case." ***Id***. ***Long*** found that the "only effect that the emergency had was to divert [the surgeon's] attention from what [he]

19

was doing at the moment and while in the process of overcoming the emergency, the hemostat was pushed out of his sight." *Id*. at 819. But the surgeon ordinarily would return to that part of the operation being performed at the time, and the surgeon here forgot he was previously in the process "of tying off the blood vessel and that he still had the upper end of the vessel clamped." *Id*. Therefore, "[w]e are of the opinion that his failure to remember constitutes negligence." *Id*.

¶63. *Long* stated further, "it is apparent that if [the surgeon] had made a proper exploration of [the patient's] abdomen after the operation, he certainly should have discovered an object as large as this hemostat." *Id*. *Long* noted that, when in the opinion of the surgeon, the life of the patient is being jeopardized by the operation, "he has in some courts been exculpated from negligence in failing to make a thorough exploration before closing the incision." *Id*. But the surgeons "were not faced with such an emergency nor did they so contend." *Id*. Accordingly, "[w]e are of the opinion that [the surgeon's] own testimony shows that he was guilty of negligence in leaving the instrument" in the patient's body, and "the trial court should have granted a peremptory instruction requested by [the plaintiff] instructing the jury that as a matter of law [the surgeon] was guilty of negligence." *Id*.

¶64. *Coleman* is the latest case from this Court dealing with a surgical apparatus unintentionally left in the body. There, a patient sued two surgeons and a hospital, claiming they were negligent by leaving a laparotomy sponge in her body following a hysterectomy operation. *Coleman*, 706 So. 2d at 697. Both doctors filed a motion for summary judgment, claiming the plaintiff had failed to support, with expert testimony, her allegations that the

20

doctors had failed to exercise the requisite degree of care, skill, and diligence ordinarily possessed by physicians. *Id*. at 697. The trial court agreed and granted summary judgment in favor of the defendants.[3]

¶65. The plaintiff appealed, and the case was assigned to the Court of Appeals, which reversed and rendered judgment in favor of the plaintiff on liability against both doctors, finding, *inter alia*: (1) there was no need for an expert to establish that a surgeon was negligent if the surgeon inadvertently left a "foreign object" in the patient's body; and (2) both doctors were negligent per se for leaving a sponge inside the patient. *Id*.

¶66. This Court granted certiorari. The *Coleman* Court agreed with the Court of Appeals that the plaintiff was not required to establish her case with expert testimony, reiterating: "medical negligence may be established without expert testimony in cases where a layman can observe and understand the negligence as a matter of common sense and practical experience." *Id*. at 698 (quoting *Erby v. N. Miss. Med. Ctr.*, 654 So. 2d 495, 500 (Miss. 1995)). *Coleman* however, reversed the Court of Appeals' "finding of liability" in favor of the plaintiff, stating that "we decline, on this scant record, to direct a finding of liability in favor of any of the parties." *Id*. at 699.

¶67. In reaching its decision, *Coleman* first expressed that the case was suitable for the application of the doctrine of *res ipsa loquitur,* based on the facts of the case. *Id*. at 698. Citing *Read*, *supra*, which did not involve a medical-malpractice claim, *Coleman* provided

---

[3] We point out that *Coleman* is silent with regard to the hospital in that case; *Coleman* related only that the trial court had granted summary judgment in favor of the doctors because they were not "vicariously liable for the actions of any other persons," and "certified the matter as a final judgment pursuant to Miss. R. Civ. P. 54(b)." *Id*.

the doctrine's elements and said that, when they are met, "a rebuttable presumption of negligence is raised." *Id*. *Coleman* then reiterated the doctrine's "requirement of 'exclusive control' of the damaging instrumentality does not limit res ipsa loquitur to a single defendant; the doctrine may be applicable where authority is shared concerning the instrumentality in question."

¶68.    Here, we must point out that, in *Coleman,* one of the surgeons had claimed via affidavit for summary judgment that he was not liable because he only partially assisted in the operation and had left the operating room before the chief surgeon had closed the patient's incision. *Coleman* commented that whether an assisting surgeon's liability is equal to that of a chief surgeon was a case of first impression in Mississippi. *Coleman*, however, declined to address the issue further, saying the "question will require a factual determination in the circuit court." *Id*. at 699.

¶69.    After agreeing with the Court of Appeals that, based on *res ipsa loquitur*, the plaintiff was not required to support her claim with expert testimony, *Coleman* noted that both defendants had "relied in their answers and . . . motion[s] for summary judgment on the assertion that nurses were responsible for keeping the sponge count during the patient's surgery, and further that this is common practice." *Id*. *Coleman* replied: "This defense is negated by our decision in *Saucier*[,]" and quoted the same language/rule from *Saucier* that *Long* quoted:

> Unexplained, the leaving of a four-inch rubber tube in a patient's body by a physician is negligence, and it occurs to us that it would be very difficult for a physician to explain how he could leave a rubber tube in a patient's body,

22

until the wound healed over same, and not be guilty of negligence in the treatment of his patient.

*Id*. (quoting **Saucier**, 112 Miss. at 314, 73 So. at 50).

¶70. **Coleman** said, "Though decided in 1916, **Saucier** has never been overruled and remains the law in this jurisdiction[,]" and "[i]t comports with case law from other jurisdictions which hold that while responsibility for sponge counts may be delegated to support staff, liability cannot be." *Id*. **Coleman** then provided: "A surgeon leaving a sponge inside a patient is not negligent per se, but a presumption of negligence is raised, which the surgeon may attempt to rebut or explain." *Id*. (citing **Ravi v. Coates**, 662 So. 2d 218 (Ala. 1995); **Tice v. Hall**, 310 N.C. 589, 313 S.E.2d 565 (1984)).

¶71. **Coleman**, **Long**, and **Saucier** are the only published decisions we know of from this Court dealing with surgical devices unintentionally left inside a patient's body. There are myriad such cases from other jurisdictions, along with treatises and articles on the subject, but with varying views. To assist this Court, we requested supplemental briefing from the parties, asking for additional authority and argument to answer certain questions we had regarding this case, which the parties helpfully provided.

¶72. Having reviewed and considered the matter further, we find that **Coleman**'s statement that, *"while responsibility for sponge counts may be delegated to support staff, liability cannot be[,]"* needs clarification. We note an early Kentucky case that expresses quite well what is meant by a surgeon's nondelegable duty in such cases.

> In performing an operation, it is the duty of a surgeon to exercise reasonable care and skill. The operation begins when the incision is made and ends when the opening has been closed in the proper way, after all the appliances

23

necessary to a successful operation have been removed from the body. Throughout the operation the law imposes on the surgeon the duty of exercising such care and skill. The removal of the sponges or pads is a part of the operation, and an operation cannot be said to be concluded until such removal takes place. For this reason, it is generally held that a surgeon cannot relieve himself from liability for injury to a patient by leaving a sponge in the wound after the operation, by any custom or rule requiring the attending nurse to count the sponges used and removed, accompanied by the statement of the nurse that the sponges were all properly accounted for, and his reliance on such statements. . . . On the contrary, surgeons are generally held liable for injuries resulting from their leaving a gauze sponge in the abdominal cavity of the patient. . . .

*Barnett's Adm'r v. Brand*, 177 S.W. 461, 464 (Ky. 1915) (citations omitted).

¶73.   Notably, the *Brand* court's explanation was in response to a complained-of jury instruction allowed by the trial court on behalf of the doctor, which the Kentucky Supreme Court held was reversible error. The instruction stated in part: "[if the] defendant was assured by said nurse that all sponges or pads were accounted for, and relied on such assurance, then the jury cannot find the defendant negligent by reason of the leaving of a sponge or pad in the body . . . ." In reversing for a new trial, the *Brand* court provided:

We are of the opinion, however, that the custom in question and the defendant's reliance on the nurse's count are proper circumstances to be considered by the jury, in connection with the other facts attending the operation, in determining whether or not the defendant exercised reasonable care and skill in the performance of the operation.

*Id*. We do not disagree with *Brand* on this view.

¶74.   Here, we must point out a jury instruction that was granted to BMH-D over Dr. Fortune's objection, Jury Instruction DB-6. It reads:

The Court instructs the jury that Doretha Thompson was a patient of Dr. James Fortune. Dr. Fortune, as the admitting and treating physician of Ms. Thompson, had a non-delegable duty to Ms. Thompson. Here, that means

24

while responsibility for sponge counts may be delegated to the nursing staff, liability cannot be.

¶75. Dr. Fortune argued to the trial court that the language, "while responsibility for sponge counts may be delegated to the nursing staff, liability cannot be" would confuse the jury. The trial court overruled the objection because this language is contained in *Coleman*.

¶76. We agree that this language is confusing, if taken out of context. And it most likely confused the jury in this case.

¶77. It must be pointed out that, given the questions as presented on appeal in *Coleman*, *Long*, and *Saucier*, no discussion was had in those cases as to the hospital's role or responsibility in such situations. In surveying the law in this area, we noticed a number of cases that were decided when the "captain of the ship" doctrine was prevalent throughout the country. This judicial doctrine came into use when most hospitals enjoyed charitable immunity. *Willis v. Bender*, 596 F. 3d 1244 (10th Cir. 2010). "Patients injured by a hospital employee's negligence were often left without a form of redress." *Id*. (citing *Lewis v. Physicians Ins. Co. of Wisconsin*, 627 N.W.2d 484 (Wis. 2001)). And "[i]n an attempt to fill this gap, courts began using the 'borrowed servant' doctrine to impose liability on the surgeon for negligence that occurred in the operating room." *Id*. The "borrowed servant" is an exception to the doctrine of "respondeat superior," which imposes vicarious liability on employers for the negligent acts or omissions of an employee if committed within the scope of employment. *Id*. Under the borrowed servant doctrine, vicarious liability is transferred from the lending employer to a borrowing employer. *Gorton v. Rice*, 52 So. 3d 351, 359 (Miss. 2011). Under the "captain of the ship doctrine" for surgeons, "[t]he notion was that

25

the surgeon acted as special employer who borrowed nurses and other attendants from their general employer–the [charitable] hospital–and thus became liable for their negligence." *Willis*, 596 F. 3d at 1262. The doctrine essentially imposed liability on a surgeon by virtue of his status rather than on the basis of his control. ***Thomas v. Raleigh Gen. Hosp.***, 358 S.E.2d 222, 224 (W.Va. 1987).

¶78. This Court abolished Mississippi's judicially created charitable-immunity doctrine in ***Mississippi Baptist Hospital v. Holmes***, 214 Miss. 906, 55 So. 2d 142, 152 (1951), explaining:

> In response to what appeared good as a matter of public policy at an early date, many of the courts have created an immunity, which, under all legal theories, is basically unsound, and especially so, when the reasons upon which it was founded no longer exists. Moreover, the function of creating a public policy is primarily one to be exercised by the Legislature and not by the courts. It is equally true that when the reason for the existence of a declared public policy no longer obtains, the court should, without hesitation, declare that such policy no longer exists, and especially where the same has been created by the courts instead of by the Legislature.

¶79. Notably, prior to ***Holmes***, this Court in ***Palmer v. Clarksdale Hospital***, 206 Miss. 680, 698, 40 So. 2d 582, 586 (1949), reiterated: "It has been repeatedly held in this state that the owner or proprietor of a private hospital, operated for profit, is liable in damages for the negligence of his employees."

¶80. A California court addressed the "captain of the ship" doctrine in ***Truhitte v. French Hospital***, 128 Cal. App. 3d 332 (Cal. Ct. App. 5th Dist. 1982). In ***Truhitte***, a jury found a surgeon and a hospital liable for injuries to a patient as a result of a surgical sponge left in the patient's abdomen during surgery. The trial court granted a JNOV in favor of the hospital

26

on the theory that the surgeon was solely liable for the negligence of the operating room nurses under the borrowed-servant doctrine. *Id*. at 343.

¶81.    In reversing the JNOV, the ***Truhitte*** court first questioned whether the "captain of the ship" doctrine had "any remaining independent existence" in California. *Id*. at 348. The court said: "A theory that the surgeon directly controls all activities of whatever nature in the operating room certainly is not realistic in present day medical care. Today's hospitals hire, fire, train and provide day-to-day supervision of their nurse-employees." *Id*. at 348. ***Truhitte*** observed that under modern-day conditions:

> The patient enters the hospital, which is specially equipped with its operating room, modern surgical appliances and trained nurses for the purpose of rendering this precise service, and a charge therefor is made directly to the patient. The nurse in performing her duties in the operating room is acting for her employer, the hospital, and not for the operating surgeon, who cannot be held responsible for her negligent acts unless performed under conditions where, in the exercise of ordinary care, he could have or should have been able to prevent their injurious effects and did not.

*Id*. at 347-48. ***Truhitte*** opined: "Fortunately, hospitals can and do implement standards and regulations governing good surgery practices and techniques and are in the best position to enforce compliance; hospitals also are in a position to insure against the risk and pass cost to consumers." *Id*. at 348-49.

¶82.    ***Truhitte*** also pointed out that other jurisdictions "draw a distinction between acts performed by a nurse in the operating room which require medical skill and judgment, and those which are 'administrative' or 'clerical.'" *Id*. When "performing 'medical' duties, the

27

nurse is generally held to be a borrowed servant of the surgeon; [but,] as to 'administrative' functions, the nurse is considered the servant of the hospital."[4]

¶83.  In construing the evidence in the case, *Truhitte* found that the hospital's rules required hospital nurses to conduct sponge counts. *Id*. at 339. "Under hospital rules, the scrub nurse counts the sponges, watched by the circulating nurse, who verifies the count and notes the number of each type of sponge count on a piece of paper." *Id*. at 340. "This notation is the basis for the second and third counts which are made prior to closing the incision and after the completion of the surgery." *Id*.  Similar to BMH-D's stated practice in this case, the hospital in *Truhitte* did not require that sponge counts be recorded on the surgical form or that the piece of paper denoting the count be "kept as a record after surgery." *Id*.

¶84.  *Truhitte* found that, based on the evidence in the case, "the jury could find that the nurses negligently performed the initial inventory of the sponges, a procedure required by the hospital to be completed as a routine function before the arrival of the surgeon." *Id*. at 350. And the jury could also find that the "informality" of the hospital's procedure or record-keeping with regard to sponge counts fell below the standard of care required of the hospital.

---

[4] The law in Mississippi provides:

> The routine acts of treatment of which an attending physician may reasonably assume may be performed in his absence by nurses of a modern hospital as part of their usual and customary duties and execution of which does not require specialized medical knowledge, are administrative acts for which negligence in their performance is imputable to the hospital.

*Winters*, 869 So. 2d at 367 (quoting *Hunnicutt v. Wright*, 986 F.2d 119, 123 (5th Cir. 1993)).

*Id*. "For example, use of a printed checklist might [have] prevent[ed] the type of omission which occurred" in the case. *Id*.

¶85. Lastly, ***Truhitte*** iterated as follows:

> It is the law of California that the surgeon's duty to remove all sponges and other [unintended] foreign objects from the patient's body is nondelegable. However, it does not follow that the hospital may escape liability for its independent negligence in failing to devise adequate sponge-accounting procedures or in negligently carrying out such procedures through its employee-nurses.

*Id*. at 349.

¶86. This is the law in Mississippi as well. Here, Dr. Fortune had a nondelegable duty to remove all the sponges from Thompson's abdomen. ***Coleman***, 706 So. 2d at 699. And based on the facts of the case, BMH-D had an independent (or concurrent) duty, apart from Dr. Fortune's, to account for the sponges.

¶87. Consistent with ***Saucier***: Unexplained, the failure of either entity to carry out its respective duties is negligence. Although neither is negligent per se (consistent with ***Coleman***), a presumption of negligence is raised as to each, which both entities are required to rebut or explain.[5]

¶88. For all of these reasons, we reverse the final judgment entered in favor of Dr. Fortune and BMH-D, and remand for a new trial with proper instructions to the jury consistent with this opinion.

**CONCLUSION**

---

[5] Jury instructions P-1 and P-2, *supra*, correctly stated the law in this case with regard to Dr. Fortune. To be clear, though, neither properly ascribe(d) for BMH-D.

29

¶89.   The judgment of the DeSoto County Circuit Court is reversed and remanded for a new trial.

¶90.   **REVERSED AND REMANDED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, MAXWELL AND ISHEE, JJ., CONCUR. CHAMBERLIN, J., NOT PARTICIPATING.**